Filed 3/12/26  Marriage of Gracie CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re the Marriage of CARLEY GRACIE and LILIAN CRISTINE LOESCHER GRACIE. | |
| CARLEY GRACIE,  Appellant,  v.  LILIAN CRISTINE LOESCHER GRACIE,  Respondent. | A172104  (Marin County Super. Ct. No. FL-22-02562) |

Carley Gracie, appearing in propria persona, challenges a trial court order appointing a receiver to sell two properties owned by him and his wife, Lilian Loescher Gracie.  Carley claims the court erred in several respects by entering the order, including because a receivership is unwarranted for either property.  We conclude he is not entitled to any relief and affirm.

I.

FACTUAL AND PROCEDURAL
BACKGROUND

Carley and Lilian were married in February 2011, had twin boys in April 2014, and separated in December 2019.  Both children have

developmental disabilities and require full-time supervision.  In April 2022, Lilian obtained a domestic-violence restraining order against Carley, and she was then granted sole legal and physical custody of the children.  That August, Lilian filed a petition to dissolve the marriage, and in response Carley also sought a divorce.

Two pieces of property in Vallejo are at issue in this appeal:  a 20.5-acre parcel of vacant land (the Skyline property), and a single-family home abutting the Skyline property (the Fleming property).  Carley and Lilian purchased the Skyline property for approximately $200,000 in 2012, and they purchased the Fleming property in 2017.  The family lived together in the Fleming property until December 2019, when Lilian moved out with the children.

At the time of the proceedings at issue, Carley still lived in the Fleming property, and Lilian and the children lived in a one-bedroom apartment in Marin County.  Carley was retired, after closing his martial arts business during the COVID-19 pandemic, and Lilian was paid about $17 per hour as a full-time, in-home caregiver for the children.

In April 2023, Lilian sought several orders, including for control over the Skyline property and child support.  In an accompanying declaration, Lilian averred that in 2020 the parties received an offer of $7 million for the Skyline property.  She presented evidence that she then obtained other offers, including one for $7.5 million in early 2023, but Carley refused to cooperate in completing a sale.  Lilian also averred that Carley was behind on the mortgage payments for the Fleming property and sought an order requiring him to either make the payments or place that property on the market.

Carley opposed the relief Lilian sought.  He stated that the most recent offer for the Skyline property had "extremely problematic" terms, including a

long escrow period and a condition requiring city approval. He also complained that the sale would result in a high capital gains tax and he "was . . . hoping to be able to live and garden on a corner of that property." He did not address his failure to pay the mortgage on the Fleming property, although he noted that the property was "upside-down, with no equity."

After a mandatory settlement conference in December 2023, the trial court reviewed competing offers for the Skyline property submitted by each party. In a January 19, 2024 order, the court concluded that Lilian's proposed deal, through Colliers Brokerage, was "in the best interest of securing funds needed to support the children and ultimately resolv[e] this marriage." Finding that "[t]ime [was] of the essence," the court directed Carley to "sign the necessary brokerage papers within 10 days of entry of order" and warned that "[h]is failure to cooperate in the sale of the property will result in the clerk of the court serving [as] his Elisor to facilitate and authorize the sale."[1] The court also ordered that Carley pay $500 per month in child support "through June 2024, or until the sale is funded."

Carley did not comply with the January 19 order, and later that month, the court clerk signed a letter of intent and listing agreement for him as elisor. On June 10, 2024, after a status hearing, the trial court found that Carley "has not complied with the court's previous orders and has not cooperated in the sale of the property." The court therefore granted Lilian "sole decision-making authority and control regarding all aspects of the sale

---

[1] "[A]n elisor is a person appointed by the court to perform functions like the execution of a deed or document," usually "on behalf of a recalcitrant party" who "refuses to execute such documents," so as to "effectuate [the court's] judgments or orders." (*Blueberry Properties, LLC v. Chow* (2014) 230 Cal.App.4th 1017, 1020.)

of the Skyline Property," including "the ability to sell the property without [Carley's] . . . consent."

Meanwhile, Carley brought an action against Lilian in Solano County to partition the Skyline property, prompting her to seek sanctions and attorney fees and costs in this matter. In a declaration accompanying the request, Lilian stated, "[Carley] has still not cooperated in the sale of the Skyline Property. There is an offer of purchase for cash for land of [$4 million], but due to the delay in getting the [trial court's June 10 order] from the court, I have not been able to finalize the sale." After a hearing, the court awarded $15,500 in attorney fees to Lilian's counsel and continued the matter to late August 2024.

On August 13, 2024, Lilian filed an ex parte application to have a receiver appointed to sell both the Skyline and Fleming properties. She declared that Carley and his real estate attorney, Ann Draper, continued to interfere with her attempts to sell the Skyline property.[2] This interference included bringing the Solano County partition action, which Carley had since dismissed, and Draper's "threatening" emails and "extensive requests for revisions of the listing agreement with Colliers." Lilian reported that on July 9, she met with a Colliers representative who said that "due to [Carley's] conduct and . . . Draper's involvement," the brokerage would not enter a listing agreement unless a receiver was appointed.

As for the Fleming property, Lilian reported that a balloon payment of approximately $230,000 was due and foreclosure proceedings had been initiated. In addition, Carley had not paid the trash service bill, which had

[2] Draper, who apparently loaned money to at least Carley in connection with the Fleming property, is the appellant in two other pending appeals involving the same trial court proceeding, nos. A173942 and A174256.

4

been put in Lilian's name without her authorization.  Thus, there was now a lien under her name on the Fleming property.

Before the hearing on Lilian's ex parte application, Carley objected that a receivership was not warranted for either property.  He denied doing "anything to interfere with the Colliers brokers" regarding the sale of the Skyline property, explaining that he did not want to sign the listing agreement because it (1) required him to waive his right to a jury trial and (2) "contain[ed] provisions that violate the U.S. antitrust law and a nationwide settlement that prohibit[s] some of the provisions of Collier[s's] proposed listing."  He also did "not agree" that the Fleming property should be sold, stating that he "believe[d] that [he] may be able to restructure the financing."  He and Lilian had "no equity" in that property, meaning there would be "no benefit . . . in selling the house.  In fact, there [would be] a detriment in selling, because the . . . homeowners insurance provides $500,000 liability insurance which extends to the adjacent Skyline acreage. If the house is sold, this coverage for the Skyline [property] goes away."

Lilian's ex parte application was heard on August 16, 2024.  The trial court issued a temporary order appointing a receiver "to facilitate the sale" of the Skyline and Fleming properties (temporary order).  The court also ordered that (1) the receiver's costs would be taken out of Carley's share of the property sales; (2) Carley would pay the trash-service lien on the Fleming property; and (3) the Fleming property would "be sold and the equity [would otherwise] be split equally between the parties."  The temporary order was set to expire on September 19, 2024, the date of the hearing on a permanent order.

Before the September hearing, Carley submitted another declaration opposing the receiver's appointment and his objections to the proposed

5

permanent order. In addition, Draper filed two declarations addressing the money the Gracies purportedly owed her and her attempts to negotiate the Colliers listing agreement on Carley's behalf. She explained at length her view, to which Carley's declaration alluded, that the listing agreement contained several objectionable terms, including ones violating the nationwide settlement in an antitrust litigation involving the real estate industry.

At the hearing, the trial court declined to reconsider its decision to appoint a receiver. Noting that the Gracies were "sitting on a mountain of real estate," the court stated, "I want the property sold as soon as possible so these two 10-year old kids, special needs kids, who are not receiving adequate support from their father can have a future and can have the education that they need." The court was "put in the position to force the sale" because the children "need[ed] the help right now."

The trial court also addressed Carley's desire to stay in the Fleming property. The receiver, who was present at the hearing, noted that this property was "very close to being underwater" if the debt owed to Draper was included. In response to the court's questioning, the receiver stated that he was working with the parties "to see what we can do about allowing [Carley] to stay in his home," and it appeared there would be "adequate funds from the sale of the Skyline property" to cover what was owed on the Fleming property.

After the hearing, the trial court signed a permanent order appointing the receiver (permanent order). In the order, the court found "that the Skyline Property is in jeopardy of not being sold and the Fleming Property is in jeopardy of being foreclosed upon, and the only way to try [to] protect the parties' equity is to appoint a Receiver to manage and sell the properties."

6

Accordingly, the order granted the receiver broad authority to maintain the properties and take all actions necessary to complete their sale.

## II.
### DISCUSSION

### A.     *We Lack Jurisdiction to Consider the Temporary Order.*

Carley first claims that the temporary order appointing a receiver should be reversed because no emergency justified it.  We lack jurisdiction to consider this order, which the permanent order superseded.

Carley's November 18, 2024 notice of appeal identifies both the August 16 temporary order and September 19 permanent order.  Generally, "an order appointing a receiver" is appealable under Code of Civil Procedure section 904.1, subdivision (a)(7).[3]  But " '[a]n order making permanent a prior ex parte order appointing a receiver is controlling,' " and once the permanent order issues no appeal lies from the temporary order.  (*People ex rel. Kenny v. Christ's Church of Golden Rule* (1947) 79 Cal.App.2d 858, 862; *Republic of China v. Chang* (1955) 134 Cal.App.2d 124, 133.)  Thus, despite Lilian's failure to raise this issue in her brief, we conclude that we lack jurisdiction to review the temporary order.  (See *Westmoreland v. Kindercare Education LLC* (2023) 90 Cal.App.5th 967, 974 [appellate court polices its own jurisdiction].)

### B.     *The Trial Court Did Not Abuse Its Discretion by Appointing a Receiver.*

Carley contends that the trial court erred by appointing a receiver for both properties because insufficient evidence supported the court's justifications for doing so and there were "less intrusive" alternatives.  We are not persuaded.

---

[3] All further statutory references are to the Code of Civil Procedure unless otherwise noted.

### 1. General legal standards

A trial court may enforce its orders in a family law case by "the appointment of a receiver . . . or by any other order as the court in its discretion determines from time to time to be necessary." (Fam. Code, § 290.) The appointment of a receiver is appropriate in various circumstances, including "where necessary to preserve the property or rights of any party" under section 564, subdivision (b)(9), a provision the permanent order cited.[4] Thus, a receiver may be appointed in a dissolution proceeding, including to effectuate an order for child support. (*Quaglino v. Quaglino* (1979) 88 Cal.App.3d 542, 546.)

"[T]rial courts enjoy a 'large measure' of discretion, albeit 'not an entirely uncontrolled one,' in deciding when to exercise their authority to appoint a receiver," meaning "we review the decision to appoint one solely for an abuse of that discretion." (*Medipro Medical Staffing LLC v. Certified Nursing Registry, Inc.* (2021) 60 Cal.App.5th 622, 627.) " 'The proper exercise of discretion requires the court to consider all material facts and evidence and to apply legal principles essential to an informed, intelligent, and just decision.' " (*City of Santa Monica v. Gonzalez* (2008) 43 Cal.4th 905, 931.) An abuse of discretion occurs "if the court's decision was not supported by substantial evidence or the court applied an improper legal standard or otherwise based its determination on an error of law. [Citation.] 'As to factual issues, "we determine whether the record provides substantial evidence supporting the trial court's factual findings. [Citation.] Applying the substantial evidence test on appeal, we may not reweigh the evidence, but consider that evidence in the light most favorable to the trial court,

---

[4] The permanent order also cited section 564, subdivision (b)(6), but that provision applies only to corporations.

indulging in every reasonable inference in favor of the trial court's findings and resolving all conflicts in its favor." ' " (*City of Crescent City v. Reddy* (2017) 9 Cal.App.5th 458, 466.)

Somewhat in tension with a court's broad discretion to appoint a receiver is case law recognizing that "the appointment of a receiver is a very 'drastic,' 'harsh,' and costly remedy that is to be 'exercised sparingly and with caution.' [Citations.] Due to the 'extraordinary' nature of this remedy and the special costs it imposes, courts are strongly discouraged—although not strictly prohibited—from appointing a receiver unless the more intrusive oversight of a receiver is a 'necessity' because other, less intrusive remedies are either ' "inadequate or unavailable." ' " (*Medipro Medical Staffing LLC v. Certified Nursing Registry, Inc.*, *supra*, 60 Cal.App.5th at p. 628.)

> 2. The trial court's decision to appoint a receiver for the Skyline property was reasonable.

Carley claims the trial court abused its discretion by appointing a receiver for the Skyline property because his refusal to sign the Colliers listing agreement was reasonable and the elisor could have signed for him in any event. We are not persuaded.

In the permanent order, the trial court found that the Skyline property was "in jeopardy of not being sold" unless a receiver was appointed. There was substantial evidence to support this conclusion. The court had selected Lilian's proposed deal through Colliers instead of Carley's proposed deal, but after the brokerage's interactions with Carley and Draper, it refused to proceed unless a receiver was appointed. In seeking a receiver, Lilian provided evidence to support her statements that (1) Carley "intimidated [Colliers] by threating to sue them for violating their fiduciary duty to [him]" and (2) Draper interfered by making "extensive requests for revisions of the listing agreement" and also "threatening [Lilian] with violation of [her]

9

fiduciary duties." Moreover, there was ample evidence that Carley repeatedly failed to cooperate in finalizing a sale and the children's need for financial support was urgent. Thus, the court did not abuse its discretion by appointing a receiver to enable a deal through Colliers to proceed.

In resisting this conclusion, Carley claims that "the real reason" Lilian asked for a receiver was not because of his "poor cooperation" but to enable Colliers to "claim judicial immunity for its antitrust violation." He argues at length that the brokerage's listing agreement violated antitrust law and the nationwide settlement. But given Carley's history of undermining the sale of the Skyline property, the court could reasonably conclude that his concerns about the listing agreement's terms were not legitimate but instead further excuses. To put it another way, regardless of whether Carley's objections to the listing agreement have any legal merit, the evidence hardly *compelled* a finding that Colliers's demand for a receiver was due solely to its recalcitrance, not his. In short, we cannot agree that there was insufficient evidence to justify a receiver.

Carley also argues that a receiver for the Skyline property was unnecessary because the only cooperation of his needed "was to sign documents," and Lilian could have gotten the elisor to sign for him. But as Lilian specifically declared in seeking a receiver, she "could not go forward with having the court sign on [Carley's] behalf because Colliers was no longer willing to enter into the agreement." In other words, the trial court did not appoint a receiver until after the less drastic remedy of appointing an elisor failed. Again, given Carley's history of thwarting the sale of the Skyline property, the court could reasonably decide to appoint a receiver to satisfy Colliers instead of forcing Lilian to come up with a new plan for sale. There was no abuse of discretion.

3. No error appears in the appointment of a receiver for the Fleming property.

In the permanent order, the trial court also found that "the Fleming property [was] in jeopardy of being foreclosed upon," and appointing a receiver was "the only way to try [to] protect the parties' equity." According to Carley, since Lilian admitted that the property had no equity and failed to demonstrate any other "benefit to be achieved for the parties from a sale by the receiver," there was insufficient evidence to support the receiver's appointment. We reject this claim.

Carley's position is premised on the notion that the trial court had to decisively find that the parties had some equity in the Fleming property to appoint a receiver. But we agree with Lilian that the court was not required to make a finding about the property's value before appointing a receiver. As we have said, a receivership is broadly warranted "where necessary to preserve the property or rights of any party." (§ 564, subd. (b)(9).) Since Lilian had an ownership interest in the Fleming property and foreclosure proceedings had been initiated, there was sufficient evidence that her property rights would be jeopardized if a receiver did not assume control. (See, e.g., *Maggiora v. Palo Alto Inn, Inc.* (1967) 249 Cal.App.2d 706, 711 [court "not required to determine the ultimate issues" involving parties' interests before appointing receiver].)

Moreover, although Carley submitted evidence below that he and Lilian had little or no equity in the property, that issue was not conceded. He claims that Lilian "several times admitted under penalty of perjury that the parties have no equity in the Fleming Property." But he cites only one example that does not support his claim, consisting of Lilian's explanation that she did not list this property on her income and expenses declaration "because we *expect* to have zero or negative balance (Mkt value-debts) after

11

sale."[5] (Italics added.) In fact, the discussion at the hearing on the permanent order suggested that whether the home was "underwater" depended upon ascertaining other potential interests in the property, such as Draper's.

The transcript of that hearing suggests another reason justifying a receiver for the Fleming property. Once the trial court properly exercised its discretion to appoint a receiver for the Skyline property, there were benefits to putting the parties' other primary asset in the receivership as well. The receiver stated at the hearing that he was trying to find a way for Carley to stay in the Fleming property by paying it off through the sale of the Skyline property. Without the receiver's involvement, such an arrangement would be harder to effectuate.

In sum, even if there was some evidence that the parties had no equity in the Fleming property, there was also substantial evidence that placing that property in a receivership would protect the parties' interests, including Carley's interest in retaining the home. The trial court did not abuse its discretion by appointing a receiver for the Fleming property.

C.     *Carley Fails to Identify Any Current Order Requiring Him to Pay the Receiver's Fees.*

Carley next argues that the trial court abused its discretion by ordering him to pay the receiver's fees instead of allocating them to the receivership estate. Our review of the record he has provided, however, shows no current order for him to pay the receiver's fees. Thus, we do not address the merits of this claim.

---

[5] Throughout his briefing, Carley fails to provide sufficient record citations or, as in this instance, provides an incorrect citation. This has made our review of his claims more difficult.

The form temporary order appointing a receiver specified that it expired on September 19, 2024, "unless extended by court order." A one-page attachment for "[a]dditional orders," which Lilian submitted with her application for the temporary order, stated that "[t]he costs incurred for [the receiver's] services [were to] be taken out of [Carley's] share of the sale of the properties."

Lilian also submitted a nine-page proposed order appointing a receiver that the trial court did not sign when it signed the temporary order. At the September 19 hearing, the receiver asked the court to sign the proposed order to "confirm the appointing order is active." The court did so, after indicating it had believed the proposed order "was attached to the emergency order."

Although it is clear the proposed order thus became the trial court's permanent order, that order did not include the terms in the one-page attachment to the temporary order requiring Carley to pay the receiver's fees. Instead, the permanent order says merely that the receiver "may be paid from the revenue of the Property or upon sale" and that the sale proceeds shall be applied first "[t]o pay the expenses of the sale including the Receiver's fees and expenses," without specifying that these costs will be taken from Carley's portion. The court did not orally extend the temporary order at the September 19 hearing, and the minute order does not mention the temporary order either.

Based on the record before us, no order requiring Carley to pay the receiver's fees is currently in effect. Thus, although a trial court generally has broad discretion to enter such an order (*City of Chula Vista v. Gutierrez* (2012) 207 Cal.App.4th 681, 685–686), we express no opinion on whether one could properly be entered here.

13

*D.*     *The Challenge to the Receiver's Super-priority Lien Lacks Merit.*

Finally, Carley claims that the permanent order "impermissibly grants super-priority status to the receiver's fees over pre-existing [liens] and reprioritize[s] the liens and other claims to be paid from the proceeds of any sale." We are not persuaded.

The permanent order provides that the proceeds of the properties' sale "shall be applied" in the following order: "a. To pay the expenses of the sale including the Receiver's fees and expenses; b. All property taxes and government assessments[;] c. All known lien holders; d. The residue shall be distributed pursuant to order of the Court." The order also authorizes the receiver to borrow money to fund his expenses and states that any such loans "shall be secured by a super[-]priority Receiver's Certificate and Deed of Trust, which can be recorded on title to the Properties." The order further provides that any loans "pursuant to such Receiver's Certificate(s) shall be deemed to be a lien of first priority which shall be repaid prior to all other encumbrances and claims, other than Receivership costs of administration."

Although Lilian does not raise the issue, we question whether Carley has standing to challenge the permanent order's prioritization of liens. "Whether a person has standing to raise a particular issue on appeal depends upon whether the person's rights were injuriously affected by the judgment or order appealed from. [Citation.] A person does not have standing to urge errors on appeal that affect only the interests of others." (*In re A.K.* (2017) 12 Cal.App.5th 492, 499.) The appellants in recent cases involving receivers' prioritized liens have been holders of other liens on the subject property, not titleholders. (E.g., *County of Sonoma v. Quail* (2020) 56 Cal.App.5th 657, 664 [appeal by mortgagee bank]; *City of Sierra Madre v. SunTrust Mortgage, Inc.* (2019) 32 Cal. App. 5th 648, 652 [same].) Carley himself does not have any

14

liens on the properties, and he does not explain why the order of liens would otherwise affect his rights.

Even if Carley has standing to make the claim, it nevertheless fails for the related reason that he does not show why the purported error was prejudicial. (See *In re Marriage of Knox* (2022) 83 Cal.App.5th 15, 40 [appellant bears burden to show prejudicial error].) He states that the super-priority lien was prejudicial to other secured creditors, but he is not in that group. And while he suggests in passing that the super-priority lien somehow gave the receiver free rein to spend money, he does not develop the argument. Because Carley does not explain why the permanent order's lien prioritization negatively affected *him*, we reject this claim.

## III.
### DISPOSITION

The September 19, 2024 order appointing a receiver is affirmed.

15

 

_____

Humes, P. J.

WE CONCUR:

_____

Banke, J.

_____

Smiley, J.

*In re Marriage of Gracie*  A172104